No. 74,860

IN THE MATTER OF THE APPEAL OF TOPEKA SMSA LIMITED PARTNERSHIP.

IN THE MATTER OF THE APPEAL OF SOUTHWESTERN BELL MOBILE SYSTEMS, INC.

IN THE MATTER OF THE APPEAL OF KANSAS CITY SMSA LIMITED PARTNERSHIP.

IN THE MATTER OF THE APPEAL OF WICHITA SMSA LIMITED PARTNERSHIP.

(917 P.2d 827)

Opinion filed May 31, 1996.

*John W. Simpson*, of Shook, Hardy & Bacon P.C., of Kansas City, Missouri, argued the cause, and *Ron Bodinson*, of the same firm, of Overland Park, was on the briefs for appellants.

*William E. Waters*, of Kansas Department of Revenue, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Providers of cellular radio service appealed to the Court of Appeals the Board of Tax Appeals' (BOTA) determination that they were "public utilities" under K.S.A 79-5a01 and the tax assessment based on that determination. The appeal was transferred to this court on the joint motion of the parties. See K.S.A. 20-3017.

K.S.A. 79-5a01 states:

"(a) As used in this act, the terms "public utility" or "public utilities" shall mean every individual, company, corporation, association of persons, lessees or receivers that now or hereafter are in control, manage or operate a business of:

"(1) A railroad or railroad corporation if such railroad or railroad corporation owns or holds, by deed or other instrument, an interest in right-of-way, track, franchise, roadbed or trackage in this state;

"(2) transmitting to, from, through or in this state telegraphic messages;

"(3) transmitting to, from, through or in this state telephonic messages;

"(4) transporting or distributing to, from, through or in this state natural gas, oil or other commodities in pipes or pipelines, or engaging primarily in the business of storing natural gas in an underground formation;

"(5) generating, conducting or distributing to, from, through or in this state electric power;

"(6) transmitting to, from, through or in this state water if for profit or subject to regulation of the state corporation commission;

"(7) transporting to, from, through or in this state cargo or passengers by means of any vessel or boat used in navigating any of the navigable watercourses within or bordering upon this state.

"(b) The terms "public utility" or "public utilities" shall not include: (1) Rural water districts established under the laws of the state of Kansas; or (2) any individual, company, corporation, association of persons, lessee or receiver owning or operating an oil or natural gas production gathering line which is situated within one county in this state and does not cross any state boundary line; or (3) any individual, company, corporation, association of persons, lessee or receiver owning any vessel or boat operated upon the surface of any manmade waterway located entirely within one county in the state."

At issue here is the definition of public utility in K.S.A. 79-5a01(a)(3), operating a business of "transmitting to, from, through, or in this state telephonic messages."

Appellants Topeka SMSA Limited Partnership, Southwestern Bell Mobile Systems, Inc., Kansas City SMSA Limited Partnership, and Wichita SMSA Limited Partnership (collectively, Taxpayer) are providers of cellular radio service. The Director of Property Valuation (Director) determined that the Taxpayer is a "public utility" under K.S.A. 79-5a01 and centrally assessed tax based on that determination. The Director issued to Taxpayer a "1994 Notice of Value Indicators, Correlated Value, Allocation Factor & Assessed Value in Kansas," (1994 Notice). The 1994 Notice assessed value at 33% based on the Taxpayer's status as a "public utility." If the Taxpayer's property had been assessed locally by counties, rather than as public utility property by the Director, the property would have been assessed at 25% of the fair market value, except machinery and equipment would have been assessed at 25% of the depreciated value as determined under K.S.A. 1995 Supp. 79-1439.

The Taxpayer filed a notice of appeal to BOTA pursuant to K.S.A. 74-2438 on June 27, 1994, claiming that it was not a "public utility" because it did not operate a business of transmitting telephonic messages and that it should have been taxed pursuant to K.S.A. 1995 Supp. 79-1439. The Taxpayer also sought a refund of taxes paid for the tax years 1984-1993. The parties entered into a

stipulation which covers the relevant facts and will be discussed later. Following argument by the parties, BOTA dismissed the Taxpayer's appeals as to the years 1984-1993. In a 3-2 decision, BOTA sustained the Director's 1994 Notice and held that the Taxpayer is a public utility. The Taxpayer filed a petition for reconsideration. See K.S.A. 74-2426(b). BOTA denied reconsideration of the issues decided but granted limited reconsideration as to issues raised by the Taxpayer but not decided by BOTA in its initial order. Prior to BOTA's decision on reconsideration, the Taxpayer appealed the original order to the Court of Appeals. That appeal was dismissed as interlocutory. Subsequently, the Taxpayer voluntarily dismissed some of the other issues raised, and in a final order on reconsideration, BOTA decided the remaining issues adversely to the Taxpayer's position. The Taxpayer appealed to the Court of Appeals. The appeal was transferred to this court on the joint motion of the parties. Prior to oral argument before this court, the Taxpayer dismissed the appeals relating to the tax years 1984-1993.

At the time the stipulation was filed (October 1994), approximately 8% of the United States population subscribed to cellular service. The parties stipulated that the Taxpayer operates a domestic public cellular radio telecommunications service within Kansas on specific radio frequencies. The cellular service system divides a large area or city into many smaller areas called "cells." Near the center of each cell is an antenna coupled to a transmitter and transceiver, called a "cell site." The equipment at each cell site is capable of receiving and transmitting signals to the radio handsets/cellular telephones operated by the Taxpayer's customers. The parties do not agree as to whether the equipment should be referred to as a "radio handset" or a "cellular telephone."

When a cellular customer originates a communication from his or her radio handset/cellular telephone, the customer's handset/telephone sends a signal by radio waves to the nearest cell site. The equipment at the cell site receives the signal generated by the customer and transmits the signal by microwave, or over dedicated local exchange telephone company facilities, to a central cellular switching office in Kansas City, Missouri. Any landlines used to transmit the signal from the cell site to the switching office are

owned by local exchange or interexchange telephone companies, not the Taxpayer, and are purchased by the Taxpayer out of the local exchange telephone company tariff.

When a cellular customer communicates with another cellular customer in the same service area (a mobile-to-mobile call), the switching office receives the originating customer's signal from the cell site and transmits the signal by microwave, or over local exchange telephone company facilities purchased by the Taxpayer, to the cell site nearest the recipient of the communication. This cell site then relays the signal by radio waves to the radio handset/cellular telephone of the recipient of the communication. When a cellular customer communicates with a telephone customer of a local exchange telephone company (a mobile-to-telephone call), the switching office receives the cellular customer's signal from the originating cell site. The switching office then transmits the signal over local exchange telephone company facilities to the local exchange telephone company's central office. At this point, the signal is routed over standard land telephone lines of the appropriate local exchange or interexchange telephone company (local or long distance) to the telephone customer to whom the communication was directed. When a telephone customer communicates with a cellular customer, the procedure for a mobile-to-telephone call is simply reversed and the signal is passed over standard land telephone lines to the telephone company's central office, over local exchange telephone company facilities to the switching office, by microwave or local exchange facilities to the cell site nearest the cellular customer and by radio waves to the handset/telephone of the cellular customer.

The Taxpayer cannot and does not own or operate telephone lines in Kansas. The landline facilities between the various cell sites and the switching office, and between the switching office and the local exchange telephone company's central office, are owned and operated by the local exchange telephone company or an interexchange carrier. These land lines are circuits dedicated entirely to the Taxpayer's cellular service system. For the landline facilities the Taxpayer pays the local exchange telephone company a monthly fee. The fee for the landline facilities between the cell site

and the switching office is based on the length of the line, and the fee for the landline facilities between the switching office and the local exchange telephone company's central office is usage sensitive.

The Taxpayer provides cellular service to its customers pursuant to a written contract and bills its customers monthly for the cellular service provided. The monthly fee includes a base cellular service access charge plus separate charges for air time on the cellular service system. For a mobile-to-mobile call, the Taxpayer charges both the sending and receiving customer for air time on the cellular service system. For a local mobile-to-telephone call, the Taxpayer charges the cellular customer for air time on the cellular service system. For a long-distance mobile-to-telephone call, the cellular customer receives a bill from the Taxpayer for air time on the cellular service system, and the cellular customer also receives a bill from the long distance carrier based on the customer's relationship with the long distance carrier. The cellular customer does not become the customer of any local exchange telephone company or long distance company through the receipt of cellular service.

The Taxpayer is licensed by the Federal Communications Commission (FCC) to operate cellular service within Kansas on specific radio frequencies. The FCC license was granted pursuant to Title 47, Part 22 of the Code of Federal Regulations, the stated purpose of which is (a) to regulate radio transmission and the issuance of licenses for radio stations, and (b) to prescribe the conditions under which portions of the radio spectrum are made available for domestic common carrier radio communications. 47 C.F.R. § 22.0(a), (b) (1993). As a licensed operator of a cellular service, the Taxpayer is prohibited from owning any facilities for the provision of landline telephone service. 47 C.F.R. § 22.901(c)(1) (1993).

Under FCC regulations, cellular service is one of several types of radio communication classified under the more general category of "commercial mobile radio service" (CMRS). 47 C.F.R. § 20.9(a)(7) (1994). To be classified as a CMRS, a radio communication service must first be classified as a "mobile service." 47 C.F.R. §20.3 (1994). FCC regulations define a "mobile service" as a "radio communication service carried on between mobile stations

or receivers and land stations, and by mobile stations communicating among themselves." 47 C.F.R. § 20.3. Cellular service is both a "mobile service" and a CMRS. 47 C.F.R. §§ 20.7, 20.9 (1994). In addition to cellular service, the following "mobile services" are also treated as CMRS providers: paging service, business radio service, public land mobile service, specialized mobile radio, air-ground radiotelephone service, offshore radio service, and personal communication service. 47 C.F.R. § 20.9(a). All of these businesses, including cellular service, use radio technology to provide communication services to their customers. By definition, all CMRS providers are interconnected with the public switched telephone network, typically through a local exchange landline telephone company, such as Southwestern Bell Telephone Company. 47 C.F.R. § 20.3. Congress has expressed an intent to treat all CMRS providers similarly from a regulatory standpoint. The FCC is currently in the process of amending its regulations to comply with this Congressional mandate. *In re Implementation of Sections 3(n) and 332 of the Communications Act, Regulatory Treatment of Mobile Services,* 9, F.C.C.R. 1411 (March 7, 1994).

Of the CMRS providers listed above, cellular carriers, paging services, specialized mobile radio services, and air-ground radio services conduct business in Kansas. Of these, only cellular providers are presently subjected by the Director to central assessment as a public utility under K.S.A. 79-5a01 *et seq.*

The Taxpayer is a "radio common carrier" within the definition of K.S.A. 66-1,143(a), which includes all companies operating a public "for hire" radio service engaged in the business of providing a service of radio communication, including cellular radio, which is one-way, two-way, or multiple, between mobile and base stations, between mobile and land stations, including landline telephones, between mobile stations or between land stations, but not engaged in the business of providing a public landline message telephone service or a public message telegraph service within this state. Under K.S.A. 66-1,143(b) and K.S.A. 66-1,145, a cellular service provider is not subject to the jurisdiction, regulation, supervision, or control of the Kansas Corporation Commission (KCC).

There are no federal, state, or local laws which regulate the rates charged by the Taxpayer for cellular service provided to customers in Kansas. The Omnibus Budget Reconciliation Act of 1993 pre-empts state or local regulation of the rates charged by any provider of CMRS, including the Taxpayer, as set forth in 47 U.S.C. § 332(c)(3) (1994). Under special circumstances, a state may seek authority from the FCC to regulate such rates. The KCC is prohibited by Kansas law from regulating radio common carriers and has made no effort to obtain FCC authority to regulate such rates.

The Taxpayer has never been subject to rate of return regulation in Kansas. There is no federal, state, or local law that guarantees the Taxpayer a rate of return on investment. Further, the FCC eliminated any implication that cellular providers could file federal tariffs and ordered any such providers with tariffs on file to cancel the tariffs by July 18, 1994. *In re Implementation of Sections 3(n) and 332 of the Communications Act, Regulatory Treatment of Mobile Services*, 9 F.C.C.R. 1411 (March 7, 1994). The Taxpayer does not offer cellular service to the public under tariffs approved by the FCC or the KCC.

The Taxpayer does not hold a monopoly on cellular service in its service areas. For FCC licensing purposes, the United States is broken down into smaller cellular markets. Each service market area has at least two cellular service providers. Pursuant to FCC regulations, the Taxpayer is one of two cellular carriers entitled to provide cellular service in its service areas. Additionally, the FCC is facilitating "personal communication service" (PCS) providers who, using radio technology similar to that used by cellular carriers, will provide mobile to land line, land line to mobile, and mobile to mobile communication services that will compete directly with the services provided by cellular carriers.

All of the property used by the Taxpayer in Kansas is either owned or leased at arm's length by the Taxpayer. Except for leases negotiated at arm's length with local governmental authorities (generally tower space leased by the Taxpayer from local governmental authorities), the Taxpayer does not make use of public property or rights-of-way in the operation of its cellular service business. Unlike local exchange landline telephone companies and

other public utilities, the Taxpayer does not have the power to condemn property in Kansas.

### Is Taxpayer a "Public Utility" Under K.S.A. 79-5a01?

The question in this appeal concerns the determination of the Director and BOTA that the Taxpayer is a public utility within the meaning of K.S.A. 79-5a01. K.S.A. 79-5a01(a)(3) defines "public utility" as "every individual, company, corporation, association of persons, lessees or receivers that now or hereafter are in control, manage or operate a business of . . . transmitting to, from, through or in this state telephonic messages."

BOTA orders are subject to judicial review under the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq*. See K.S.A. 74-2426(c). The party challenging BOTA's action has the burden to prove that the action taken by BOTA was erroneous. See K.S.A. 77-621(a). The Taxpayer suggests that BOTA "erroneously interpreted or applied the law" and that BOTA's decision was "otherwise unreasonable, arbitrary or capricious." See K.S.A. 77-621(c)(4), (8).

The interpretation of a statute by an administrative agency charged with the responsibility of enforcing a statute is entitled to judicial deference, called the doctrine of operative construction. See *State Dept. of SRS v. Public Employee Relations Board*, 249 Kan. 163, 166, 815 P.2d 66 (1991). Deference to an agency's interpretation is particularly appropriate when the agency is one of special competence and experience. See *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 246, 834 P.2d 368 (1992). However, although an appellate court gives some deference to the agency's interpretation of a statute, the final construction of a statute lies with the appellate court, and the agency's interpretation, while persuasive, is not binding on the court. Interpretation of a statute is a question of law over which an appellate court's review is unlimited. See *Todd v. Kelly*, 251 Kan. 512, 515, 837 P.2d 381 (1992).

The Taxpayer makes several arguments in support of its position that it is not a public utility subject to K.S.A. 79-5a01 *et seq*. based on (1) this court's decision in *First Page, Inc. v. Cunningham*, 252 Kan. 593, 847 P.2d 1238 (1993); (2) the legislature's indication of

an intent not to treat cellular service as a telephone service in various statutes; (3) the decisions of other jurisdictions indicating that cellular service is not a telephone service; and (4) the contention that the "natural and ordinary meaning" of telephonic does not include cellular communications. After reviewing each of the arguments and the Kansas statutes and decisions of other jurisdictions, we determine that our decision in *First Page* controls.

*First Page*, 252 Kan. 593, involved the appeal of First Page from the district court's decision upholding the Director's determination that its business was a public utility. At issue was the same definition of public utility with which the court is here faced—transmitting telephonic messages, K.S.A. 79-5a01(a)(3). First Page, like the Taxpayer here, was a radio common carrier. First Page offered one-way paging services transmitted by radio frequency. The district court recognized that "transmitting telephonic messages" was not defined in Chapter 79 of the Kansas Statutes Annotated, so the district court applied the definition found in K.S.A. 66-104, which defines public utilities subject to the supervision of the KCC and states:

> "The term 'public utility,' as used in this act, shall be construed to mean every corporation, company, individual, association of persons, their trustees, lessees or receivers, that now or hereafter may own, control, operate or manage, except for private use, any equipment, plant or generating machinery, or any part thereof, for the transmission of telephone messages or for the transmission of telegraph messages in or through any part of the state . . . . *As used herein, the term 'transmission of telephone messages' shall include the transmission by wire or other means of any voice, data, signals or facsimile communications, including all such communications now in existence or as may be developed in the future.*" (Emphasis added.)

The district court ruled that First Page was a public utility for property tax purposes. First Page appealed.

In rejecting the application of the K.S.A. 66-104 definition to K.S.A. 79-5a01, the *First Page* court recognized the legislature removed radio common carriers from KCC supervision by enacting K.S.A. 66-1,143. 252 Kan. at 599. Radio common carriers are defined in K.S.A. 66-1,143 to include all companies

"operating a public 'for hire' radio service engaged in the business of providing a service of radio communication, including cellular radio, which is one-way, two-way or multiple, between mobile and base stations, between mobile and land stations, including land line telephones, between mobile stations or between land stations, but not engaged in the business of providing a public land line message telephone service or a public message telegraph service within this state."

The *First Page* court concluded that the K.S.A. 66-104 definition of "transmission of telephone messages" should not be read into K.S.A. 79-5a01. The court noted that tax statutes will not be extended by implication beyond the clear import of the language employed therein and will not be enlarged so as to include matters not specifically embraced. The court also recognized that a tax statute will be construed most favorably to the taxpayer where there is a reasonable doubt as to the meaning of it. 252 Kan. at 600. Although both K.S.A. 66-104 and K.S.A. 79-5a01 define public utility, they contain different definitions of the term and do so for different purposes, 66-104 for determining the KCC's scope of regulatory authority and 79-5a01 for determining the Director's scope of assessment authority. The *First Page* court held that the definitions are not interchangeable.

The *First Page* court also reviewed decisions of appellate courts of Illinois and Ohio holding that one-way paging services were not businesses engaged in the transmission of telephone messages and of Connecticut holding that a one-way radio paging company was not a "telephone answering service." 252 Kan. at 602-03. The *First Page* court found those decisions persuasive. The court also noted:

"First Page has none of the trappings of a public utility. Its service is a convenience rather than an essential service. It is highly competitive rather than a monopoly. It does not make use of public property or rights-of-way and does not require a franchise or authority to operate. It is not guaranteed a rate of return on investments and cannot offset a tax increase by requesting a rate increase." 252 Kan. at 605.

Further, the court found that the natural and ordinary meaning of transmitting telephonic messages does not include one-way radio paging. 252 Kan. at 605. For all of these reasons the court concluded that First Page was not a public utility within the meaning of K.S.A. 79-5a01.

The Taxpayer points out that, like First Page, it is a "radio common carrier" within the meaning of K.S.A. 66-1,143(a). According to the Taxpayer's analysis, this court decided in *First Page* that the Kansas Legislature did not intend for a radio common carrier to be a public utility under K.S.A. 79-5a01.

The Taxpayer also highlights the statement in *First Page* concerning the "trappings" of a public utility. There are no other Kansas cases discussing the trappings of a public utility but, as the Taxpayer points out, the Kansas Attorney General has recognized those factors as being useful in determining what types of entities are included in the definition of public utility for purposes of tax classification. See Atty. Gen. Op. No. 93-142.

The Taxpayer notes its similarity to the one-way radio paging company in *First Page* as to the trappings analysis: (1) The Taxpayer's business provides a service of convenience rather than an essential service. Only 8% of the population of the United States subscribes to cellular service. (2) The Taxpayer's business is a competitive one rather than a monopoly. There are at least two cellular providers in each cellular market area. (3) The Taxpayer does not make use of public property or rights-of-way. Rather, its property is owned by the Taxpayer or leased in arm's-length transactions, and it does not have the power to condemn property in Kansas. (4) The Taxpayer requires federal, rather than state, licensing to operate its cellular business. It is classified as a "radio common carrier" under K.S.A. 66-1,143 and is not subject to the jurisdiction of the KCC. (5) The Taxpayer is not guaranteed a rate of return on investments but is subject to the competitive market.

BOTA rejected the trappings analysis, stating that these factors were not the determinative point in *First Page*. Further, accepting the argument made by the Director, BOTA distinguished *First Page* on the basis that it involved a one-way radio paging service rather than two-way communication.

The Taxpayer, citing a report of the FCC, asserts that the distinction between a one-way radio paging service and a two-way cellular radio communication is insignificant. In *In re Implementation of Sections 3(n) and 332 of the Communications Act*, 9 F.C.C.R. 7988 (September 23, 1994), the FCC adopted rules to

implement the statute and establish regulatory symmetry among similar mobile services. The report notes that cellular service is expected to reach 20% penetration, or approximately 54 million customers, by the year 2000, and the paging industry is expected to have 41.5 million customers by the year 2000. 9 F.C.C.R. at 8018. The FCC determined that services will be deemed to be substantially similar if they compete against each other or have the potential to compete against each other. 9 F.C.C.R. at 8024. The report states:

"In approaching the issue of 'reasonable interchangeability,' we must first determine the types of customer uses and needs that are served in the mobile marketplace. It could be argued that the mobile marketplace is nothing more than a constellation of diverse service offerings that seldom intersect in meeting highly differentiated customer needs. Thus, it could be argued . . . that cellular customers could not reasonably be expected to purchase one-way paging as a substitute. *We do not subscribe to such a balkanized view of the CMRS marketplace. Such a narrow conception does not comport with the realities of the marketplace, does not advance our objectives under the Communications Act, and, we believe, is not consistent with antitrust principles.*" (Emphasis added.) 9 F.C.C.R. at 8020-21.

The report goes on to note that the common characteristic of mobile service customers is their need to communicate electronically on a real-time basis while they are "on the move." While this need cannot be met by conventional wireline telecommunications services, it can be met by the services comprising the CMRS marketplace. Although the CMRS's such as paging services, cellular services, and mobile data services meet the communications needs of their customers in different ways by providing services with different features and functions, the FCC report concludes that all of the services compete or have the potential to compete with one another to serve customers' needs. In other words, the report found that services meeting the same customer needs in different ways can in fact be viewed as competing with each other. 9 F.C.C.R. at 8021.

"One-way paging service illustrates this . . . point. One-way paging and cellular service meet customer needs in substantially different ways: the paging subscriber can receive communications through a single tone, multiple tones, numeric messages, or alphanumeric messages. The cellular customer, on the other hand,

has the capability of establishing two-way voice communication. Notwithstanding these functional differences, we conclude that there is a basis for finding that these services compete with one another. First, paging and cellular companies perceive themselves as competing for the same customers. . . .

"Second, cellular carriers are in a position to begin offering one-way paging in conjunction with their cellular offerings. . . . [C]ellular operators are seeking to combine their service with one-way paging in order to compete against paging providers, hoping that customers will find the combined cellular-paging more attractive than a 'stand-alone' paging offering. . . .

"Finally, it appears that both cellular and paging companies are pursuing marketing strategies that emphasize the need to establish nationwide service and to expand their offerings to meet the needs of non-business customers. This commonality in marketing strategies, coupled with the other factors described in the preceding paragraphs, suggest that one-way paging and cellular carriers are or will be competing with one another." 9 F.C.C.R. at 8021-24.

The Taxpayer reasons that because the FCC recognizes that one-way paging systems and cellular systems provide similar services, this court should also find that the systems are similar. Thus, according to the Taxpayer, it is insignificant that *First Page* involved a one-way paging provider because the same analysis would apply to the Taxpayer as a cellular provider.

BOTA was not convinced by the Taxpayer's argument that the legislature would have included specific reference to both telephone service and subscriber radio service in K.S.A. 79-5a01 if it had intended for both to be taxed as public utilities. A majority of the members of BOTA observed that the *First Page* court stated that "the natural and ordinary meaning of transmitting telephonic messages does not include *one-way* radio paging" (emphasis added), and BOTA determined the *First Page* decision was limited to a conclusion that a company in the business of providing "one-way radio paging" is not transmitting to, from, through, or in this state telephonic messages and thus is not a public utility under K.S.A. 79-5a01. They noted that the Kansas Supreme Court considered the five attributes of a regulated public utility but opined that these factors were not the determinative point in *First Page*.

In reaching its conclusion BOTA focused too closely on the fact that the taxpayer in *First Page* was providing one-way radio paging service rather than on our statutory interpretation that the taxpayer was not subject to assessment under K.S.A. 79-5a01. Simply stated,

a majority of BOTA found that because the advancement in CMRS technology from one-way paging to two-way voice communication allowed radio common carriers to compete with telephone utilities, the radio common carrier providing cellular service was a "public utility" and subject to state assessment pursuant to K.S.A. 79-5a01.

Competition alone is not a determinative factor for changing the Taxpayer's classification under the statutes. Commercial transportation includes buses and airplanes, both of which are common carriers competing for passengers. Buses travel upon the land. Airplanes use the land for take-off and landing but travel through the air. The fact that an airplane must use the land in providing its services does not mean that an airplane should be classified and taxed in the same manner as a bus.

We find *First Page* controlling. A radio common carrier operating a public "for hire" radio service engaged in the business of providing a service of radio communication, including cellular radio, which is one-way, two-way, or multiple, but not engaged in the business of providing a public landline telephone or telegraphic service within this state, is not "transmitting to, from, through or in this state telephonic messages" within the meaning of K.S.A. 79-5a01. BOTA erred in holding that the radio common carrier is a "public utility" within the meaning of K.S.A. 79-5a01 and therefore subject to state assessment for property tax purposes.

Reversed and remanded.