No. 80,692

IN THE MATTER OF THE APPEAL OF UNITED TELESERVICES, INC.,
d/b/a UTLD FROM AN ORDER OF THE DIRECTOR OF PROPERTY
VALUATION.

(983 P.2d 250)

Opinion filed July 9, 1999.

*William E. Waters*, Division of Property Valuation, argued the cause and was on the briefs for appellant Mark S. Beck, Director of Property Valuation.

*Benjamin J. Neill*, of Neill, Scott, Terrill & Embree, L.L.C., of Lenexa, argued the cause and was on the brief for appellee.

*Martha L. Cooper*, advisory counsel, of the Kansas Corporation Commission, was on the brief for *amicus curiae* Kansas Corporation Commission.

The opinion of the court was delivered by

LOCKETT, J.: The Kansas Department of Revenue appeals the Board of Tax Appeals' (BOTA) determination that resellers of long distance transmissions, who purchase the service of transmitting telephonic messages from others, are not public utilities as defined by K.S.A. 79-5a01 and, therefore, are not subject to valuation and tax assessment by the Kansas Division of Property Valuation (PVD).

United Telephone Long Distance Company (UTLD), a subsidiary of Sprint Corporation, began business in 1987 and first became liable for property taxes in 1988. UTLD filed an ad valorem tax return form with the Johnson County assessor in 1988. In 1989, the Kansas Corporation Commission (KCC) recommended that UTLD be appraised by the State. For tax years 1989 and 1990, UTLD filed a rendition with the PVD and was state assessed. For the tax years 1991 through 1995, the assets of UTLD were reported to the PVD as nonoperating assets of its parent company, United Telephone Company of Kansas. In 1996, the PVD notified UTLD that it was required to file a separate tax form. UTLD complied and filed as an independent company with the PVD for the years 1996 and 1997.

UTLD objected to taxation as a public utility under K.S.A. 79-5a01, claiming that it was not a public utility because it did not have the capacity to transmit telephonic messages. A hearing was conducted before the PVD. The PVD found that UTLD was a public utility and should be assessed by the State. UTLD appealed to BOTA. BOTA concluded that UTLD was a reseller of time and was not in the business of transmitting telephonic messages; therefore, it was not a public utility subject to valuation and tax assessment by the PVD under K.S.A. 79-5a01. The PVD's motion for reconsideration by BOTA was denied. The PVD appealed to the Court of Appeals. The case was transferred to this court pursuant to K.S.A. 20-3018(c). The KCC filed an amicus curiae brief.

The interpretation of a statute by an administrative agency charged with the responsibility of enforcing a statute is entitled to judicial deference and is called the doctrine of operative construction. Deference to an agency's interpretation is particularly appropriate when the agency is one of special competence and experience. Although an appellate court gives deference to the agency's interpretation of a statute, the final construction of a statute lies with the appellate court, and the agency's interpretation, while persuasive, is not binding on the court. Interpretation of a statute is a question of law over which an appellate court's review is unlimited. *In re Appeal of Topeka SMSA Ltd. Partnership*, 260 Kan. 154, 162, 917 P.2d 827 (1996).

Tax statutes will not be extended by implication beyond the clear import of language employed therein, and their operation will not be enlarged so as to include matters not specifically embraced. Where there is reasonable doubt as to the meaning of a taxing act, it will be construed most favorable to the taxpayer. *First Page, Inc. v. Cunningham*, 252 Kan. 593, 600, 847 P.2d 1238 (1993).

The term "public utility" is defined at K.S.A. 66-104 and K.S.A. 79-5a01. The definitions in the two statutes are not interchangeable. The statutes contain different definitions of the term and do so for different purposes. K.S.A. 66-104 defines "public utility" for the purpose of determining the KCC's scope of regulatory authority. *SMSA*, 260 Kan. at 164. In that statute, "public utility" means a company that owns, controls, operates, or manages any equip-

ment, plant, or generating machinery for the transmission of, among other things, telephone messages. K.S.A. 79-5a01 defines "public utility" for the purpose of determining the PVD's assessment authority. *SMSA*, 260 Kan. at 164. K.S.A. 79-5a01(a)(3) defines a public utility as a company operating a business of "transmitting to, from, through, or in this state telephonic messages." Therefore, the definition found in K.S.A. 79-5a01 is applied in this case to determine whether the State has authority to assess UTLD as a business transmitting telephonic messages, *i.e.*, a public utility.

UTLD's expert testified at the BOTA hearing that UTLD is a reseller of long distance services, stating:

"[W]hat resellers do is resell the services of the interexchange companies. And so in effect they don't own fiber, they don't own switches, they don't own what we call POPs, points of presence. They're simply a marketing entity that tries to find a market and sell what they have purchased from the interexchange carriers.

. . . .

"[U]nder FCC rules, interexchange carriers are required to resell services to create a healthy competitive environment. So they purchase those services either out of a wholesale tariff at the FCC or on a contract basis from the facilities providers.

. . . .

"[T]hey don't have to sell at the same price [as the interexchange carrier], it's a very competitive market. Sprint, for instance, has just in the last few months announced agreements to become the underlying carrier for Nynex Bell, Atlantic, Southwestern and Pacific Bell. So you don't have to charge the same rates, you can negotiate contracts based upon the level of services you provide and they're priced that way, but you cannot discriminate. So, you know, there is that safeguard."

The expert witness, who is a Sprint executive and former member of the KCC, testified that he would characterize UTLD as a marketing company. According to this expert, Sprint, unlike UTLD, transmits the telephonic messages, while UTLD markets the telecommunication services of Sprint. The expert admitted that UTLD is a seller and a buyer of transmission capacity. In later testimony another witness, the general manager for UTLD, when asked to describe the product of UTLD, stated that UTLD's "[p]roducts are nothing more than long distance telephone service."

On Schedule I of UTLD's state tax rendition, UTLD character-ized the nature of its business as "[r]esale of telecommunication services." This is consistent with the UTLD expert's description of its business.

BOTA concluded UTLD is not a "public utility" as defined in K.S.A. 79-5a01 because UTLD is not engaged in the business of transmitting telephonic messages. UTLD resells time only. UTLD does not have custody or control over the equipment and lines necessary for the transmission of a telephonic message. Based upon these conclusions, BOTA found that UTLD is not subject to valuation and assessment by PVD as a public utility.

For support of its claim that it is not a public utility, UTLD points out to this court that K.S.A. 79-5a01 was enacted in 1969, prior to the break up of AT&T. UTLD concludes that when en-acted, the statute's description of "public utility" referred to a mo-nopolistic entity providing an essential commodity or service. UTLD contends since that entity no longer exists, the statute can-not be interpreted in terms of the original legislative intent.

The PVD disagrees with UTLD's contention and directs the court's attention to the 1986 amendment to K.S.A. 79-5a01(b). It points out that prior to 1986, the statute contained specific excep-tions to the definition of "public utility." In 1986, the language between subsections (b)(2) and (b)(4) was struck by the legislature:

"(a) As used in this act, the terms 'public utility' or 'public utilities' shall mean every individual, company, corporation, association of persons, lessees or receivers that now or hereafter are in control, manage or operate a business of:

. . . .

"(3) transmitting to, from, through or in this state telephonic messages;

. . . .

"(b) The terms 'public utility' or 'public utilities' shall not include: (1) Rural water districts established under the laws of the state of Kansas; or (2) any indi-vidual, company, corporation, association of persons, lessee or receiver which is engaged in the business of selling or leasing telephonic equipment, products, or services and (A) which is not regulated by either the state corporation commission or the federal communications commission as to the price of such equipment, products or services or (B) which does not offer telephone service to the public under tariffs approved by the state corporation commission or the federal com-munications commission, even if such individual, company, corporation, associa-tion of persons, lessee or receiver is a subsidiary of or affiliated with a public utility

providing telephone service to the public; or (3) the nonregulated portion of a public utility's telephone service operation where that activity is conducted separately from its public utility telephone service operation or separate books and records or accounts are maintained for such nonregulated operation; or (4) any individual, company, corporation, association of persons, lessee or receiver owning or operating an oil or natural gas production gathering line which is situated within one county in this state and does not cross any state boundary line; or (5) (3) any individual, company, corporation, association of persons, lessee or receiver owning any vessel or boat operated upon the surface of any manmade waterway located entirely within one county in the state." L. 1986, ch. 371, § 1.

This court previously considered the legislature's intention in the 1986 amendment in *First Page, Inc. v. Cunningham*, 252 Kan. 593. In its analysis, the *First Page* court quoted the words of the Director of the PVD in the Director's address to the House Committee on Assessment and Taxation in 1986:

"The language we are requesting you strike was originally added to the statute, at the request of Southwestern Bell, to exclude from state assessment the non-regulated activities of a utility and was aimed at excluding Bell's phone stores. Because of the restructuring of Bell, we believe such an exception is now unnecessary. Under the new structure of the company no argument could be made that these stores fall under the purview of state assessment." 252 Kan. at 604.

While the 1986 amendment does not address the issue in this case, it demonstrates the legislature considered the language and implications of the statute in the context of the deregulated telecommunications industry. Therefore, there is no reason for this court to conclude, as posited by UTLD, that because the statute was originally enacted in the context of a telecommunications monopoly, it is now impossible to interpret the intention of legislature when enacting the statute. After deregulation, the deleted language became superfluous and the legislature determined that it was sufficient that the definition of "public utility" include only those entities engaged in the business of transmitting telephonic messages.

To date, few Kansas cases have considered the definition of "public utility" in the context of telephonic transmissions. *First Page* was an action challenging the PVD's authority pursuant to K.S.A. 79-5a01 *et seq.* to assess radio common carriers engaged in the business of providing one-way paging services transmitted by radio. The district court dismissed the plaintiff's petition on the

basis that the plaintiff failed to exhaust its administrative remedies and held that a radio paging service was a "public utility" within the meaning of K.S.A. 79-5a01 and subject to state assessment for property tax purposes.

Simply stated, First Page contended that it was a paging company in the business of transmitting radio messages about telephone communications. The *First Page* court noted that a paging business was separate and distinct from the business of providing the means for actual telephone communications. The paging company transmitted a radio message to its subscriber that someone wanted to be in telephonic communication with the subscriber. It was the telephone company, not the paging company, that made it possible for the subscriber to have actual telephone communication.

The *First Page* court found a paging company had none of the trappings of a public utility. Its service was a convenience rather than an essential service. Radio paging was a highly competitive industry rather than a monopoly. Radio paging did not make use of public property or rights-of-way and did not require a franchise or authority to operate. A radio paging company was not guaranteed a rate of return on investments and could not offset a tax increase by requesting a rate increase. 252 Kan. at 605.

The *First Page* court observed that the natural and ordinary meaning of transmitting telephonic messages did not include one-way radio paging. It concluded that a company in the business of providing one-way radio paging service to its customers was not " 'transmitting to, from, through or in this state telephonic messages.' " The court determined that a radio paging company was not a public utility within the meaning of K.S.A. 79-5a01. 252 Kan. at 605.

In *SMSA*, 260 Kan. at 155, the taxpayer (SMSA) provided a public cellular radio telecommunication service. The PVD determined that SMSA was a public utility and subject to property tax assessment on that basis. On appeal to BOTA, the parties stipulated that SMSA operated a domestic public cellular radio telecommunications service within Kansas on specific radio frequencies. The cellular service system divided a large area or city into many smaller

areas called "cells." Near the center of each cell was an antenna coupled to a transmitter and transceiver, called a "cell site." The equipment at each cell site was capable of receiving and transmitting signals to the radio handsets/cellular telephones operated by the taxpayer's customers. BOTA sustained the PVD's determination that SMSA was a public utility, and SMSA appealed.

The *SMSA* court observed that the taxpayer was a "radio common carrier" defined by K.S.A. 66-1,143(a), which includes all companies operating a public "for hire" radio service engaged in the business of providing a service of radio communication, including cellular radio, which is one-way (*i.e.*, *First Page*), two-way, or multiple, between mobile and base stations, between mobile and land stations, including landline telephones, between mobile stations or between land stations, but not engaged in the business of providing a public landline message telephone service or a public message telegraph service within this state. The court noted that under K.S.A. 66-1,143(b) and K.S.A. 66-1,145, a cellular service provider was not subject to the jurisdiction, regulation, supervision, or control of the Kansas Corporation Commission.

The *SMSA* court further noted that there were no federal, state, or local laws which regulate the rates charged by SMSA for cellular service provided to customers in Kansas. The federal Omnibus Budget Reconciliation Act of 1993 preempted state or local regulation of the rates charged by any provider of commercial mobile radio service, including SMSA, as set forth in 47 U.S.C. § 332(c)(3) (1994). Under special circumstances, a state could seek authority from the FCC to regulate such rates. The court observed that the KCC was prohibited by Kansas law from regulating radio common carriers, and the KCC had made no effort to obtain FCC authority to regulate such rates.

In addition, SMSA had never been subject to rate of return regulation in Kansas. There were no federal, state, or local laws that guaranteed SMSA a rate of return on its investment. Further, the Federal Communications Commission (FCC) eliminated any implication that cellular providers could file federal tariffs and ordered any such providers with tariffs on file to cancel the tariffs by July 18, 1994. The court noted that SMSA did not offer cellular

service to the public under tariffs approved by the FCC or the KCC.

The *SMSA* court further found that all of the property used by SMSA in Kansas was either owned or leased at arm's length by SMSA. Except for leases negotiated at arm's length with local governmental authorities (generally tower space leased by the taxpayer from local governmental authorities), SMSA did not make use of public property or rights-of-way in the operation of its cellular service business. Unlike local exchange landline telephone companies and other public utilities, SMSA did not have the power to condemn property in Kansas.

The *SMSA* court determined that the decision of *First Page* was controlling. It found that a radio common carrier operating a public "for hire" radio service engaged in the business of providing a service of radio communication, including cellular radio, which is one-way, two-way, or multiple, and not engaged in the business of providing a public landline telephone or telegraphic service within this state, was not "transmitting to, from, through or in this state telephonic messages" within the meaning of K.S.A. 79-5a01. It determined that BOTA erred in holding that such a radio common carrier was a "public utility" under K.S.A. 79-5a01 subject to state assessment for property tax purposes. 260 Kan. at 168.

Here, UTLD argues that the rationale and conclusions of *First Page* and *SMSA* support its position that UTLD is not a public utility because UTLD does not own or actually operate any transmission equipment; therefore, it cannot and does not transmit telephonic messages. UTLD's argument fails. Although lack of assets in Kansas was a characteristic of the radio company discussed in *SMSA*, that fact was not a dispositive of the issue raised. The *SMSA* court followed the reasoning of *First Page* that a radio service was neither a telephone or telegraphic service nor a public utility as defined by K.S.A. 79-5a01. See 260 Kan. at 164, 168.

For support of its claim that UTLD is a public utility, PVD cites *U.S. Transmission Sys. v. Bd. of Assessment*, 715 P.2d 1249 (Colo. 1986). In a later case relying on *U.S. Transmission Sys., Ala. Dept. of Revenue v. Telamarketing Comm.*, 514 So. 2d 1388 (Ala. Civ. App. 1987), an Alabama taxpayer, a reseller of telephone services,

purchased long distance telephone service from traditional telephone companies in bulk and resold the service to its customers at lower rates than the customers of the traditional companies received. An Alabama statute imposed a license or privilege tax on persons engaged in the "telephone business." The Alabama taxpayer argued that it was not a telephone company because it did not own transmission facilities. The issue was whether the reseller of telephone services was engaged in the "telephone business" as defined by statute.

The Alabama court discussed *U.S. Transmission Sys.* In that case the Colorado taxpayer, United States Transmission Systems, Inc. (USTS), had argued that it was not a telephone company because it did not own transmission facilities and had to rely on traditional telephone companies to complete the communications link. The Colorado court stated:

" '[I]f the company directly facilitates two-way communication between a significant number of unrelated persons or businesses, as USTS did, that company is a telephone company. Since the partial breakup of the national telephone monopoly, no company provides complete and consolidated local and long distance telephone service and all essential equipment. If we were to adopt the position of USTS, no company, including Mountain Bell and AT&T, could be considered a telephone company, a result we believe to be manifestly inconsistent with legislative intent.' " *Telamarketing Comm.*, 514 So. 2d at 1390 (quoting *U.S. Transmission Sys.*, 715 P.2d at 1254).

The Alabama court found Colorado's reasoning to be persuasive. It stated:

". . . The evidence shows that the [Alabama] taxpayers are engaged in the business of providing long distance communication between persons, just as the traditional telephone companies. . . .

"In short, we conclude the taxpayers are telephone companies engaged in the 'telephone business' within the scope of the [the license or privilege tax]." *Telamarketing Comm.*, 514 So. 2d at 1390-91.

In *MCI Telecommun. Corp. v. Limbach*, 68 Ohio St. 3d 195, 625 N.E. 2d 597, *cert. denied* 513 U.S. 818 (1994), MCI, an interexchange telephone carrier, challenged on equal protection grounds the Ohio Tax Commissioner's authority to assess MCI's personal property at 100 percent of true value while assessing its competi-

tors at 31 percent of true value. The Ohio Board of Tax Appeals made no findings on the equal protection challenge, but reversed an order of the commissioner on an apportionment question. MCI appealed.

The Ohio court applied the standard articulated in *Nordlinger v. Hahn*, 505 U.S. 1, 120 L. Ed. 2d 1, 112 S. Ct. 2326 (1992):

" 'Equal Protection Clause of the Fourteenth Amendment, § 1, commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike. *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 [40 S. Ct. 560, 561, 64 L. Ed. 989, 990-991] (1920).

" 'As a general rule, "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *McGowan v. Maryland*, 366 U.S. 420, 425-426 [81 S. Ct. 1101, 1105, 6 L. Ed. 2d 393, 399] (1961). Accordingly, this Court's cases are clear that, unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest. [Citations omitted.]' " *MCI*, 68 Ohio St. 3d at 199.

The Ohio court observed that in *Allegheny Pittsburgh Coal v. Webster County*, 488 U.S. 336, 102 L. Ed. 2d 688, 109 S. Ct. 633 (1989), the United States Supreme Court upheld the power of the state to divide different kinds of property into classes and to assign to each a different tax burden so long as those divisions and classifications are neither arbitrary nor capricious. However, the Court rejected the Webster County assessor's application of the state tax law where the assessor's method resulted in an unreasonable disparity in assessed value between the taxpayer's property and similarly situated property. The Court held that the intentional, systematic undervaluation of such other property unfairly deprived the taxpayer of its rights under the Equal Protection Clause. *MCI*, 68 Ohio St. 3d at 199.

MCI pointed out to the Ohio court that it owned or leased equipment similar to that owned or leased by resellers of telephone services. The equipment included switches, telephone processing

equipment, and general office equipment. The only distinction between MCI and the resellers was that MCI, a facility-based carrier, owned or leased the transmission equipment while resellers leased WATS lines from other interexchange carriers. However, MCI urged this was a distinction without a difference, since resellers essentially leased a portion of the interexchange companies' transmission equipment in leasing WATS lines. To counter this, the commissioner argued that resellers, unlike "telephone companies," did not own or lease the transmission equipment but merely bought and sold transmission service from companies that owned the transmission equipment.

The Ohio court found that the commissioner's argument ignored a prior order of the Ohio Public Utilities Commission which determined that resellers transmitted telephonic messages as a "telephone company" within the meaning of that term as contained in the tax code in the disputed year. Moreover, the commission had held that facility-based carriers and resellers were in the same interexchange carrier category, and the commission regulated both in the same manner. The commission required both to be certified by the commission and both to set their rates flexibly within the range approved by the commission. The commission had applied virtually all other oversight procedures to both carriers.

The Ohio court found that resellers of telephone services and MCI were taxpayers within the same class owning or leasing the same type of equipment; therefore, unequal tax treatment denied MCI equal protection of the laws. As MCI had argued, its equipment should have been valued as general business property rather than as public utility property. The Ohio court held that: (1) the commissioner denied MCI equal protection by overvaluing its property in relation to the property of its competitors, based solely on the distinction that its competitors were resellers who did not own or lease transmission equipment but only leased WATS lines from other interexchange carriers, and (2) their decision on the equal protection claim rendered the apportionment issue moot. *MCI*, 68 Ohio St. 3d at 200-01.

Here, UTLD purchases access for long distance service from Sprint, and then UTLD sells long distance service to consumers.

Although UTLD does not actually transmit messages, UTLD operates a business of transmitting telephonic messages by contracting for the service. In addition to obtaining a certificate of authority from the KCC, resellers must file tariffs with the KCC, contribute to the Kansas Universal Service Fund pursuant to K.S.A. 1998 Supp. 66-2008(b), and file annual reports with the KCC. The tariffs filed by a reseller control the utility's relationship with its customers. See *Grindsted Products, Inc. v. Kansas Corporation Comm'n,* 262 Kan. 294, 309, 937 P.2d 1 (1997). As such, a reseller is subject to complaint proceedings and investigation by the KCC under K.S.A. 1998 Supp. 66-1,191 and 66-1,192. In addition, the practices and services provided by a reseller are subject to complaint proceedings and investigation by the KCC under the same Kansas statutes.

In the telecommunications industry there are facility-based and nonfacility-based resellers of long distance telephone services. Facility-based resellers own transmission and telephonic assets; whereas, nonfacility-based resellers own no transmission or telephonic assets. UTLD is a nonfacility-based reseller. Does the fact that UTLD cannot transmit the telephonic messages by the use of its equipment remove it from the definition of public utility?

K.S.A. 79-5a01 does not define a public utility in terms of its custody or control over equipment. The term "custody" is not in the statute at all, and the term "control" refers to the "business of transmitting . . . telephonic messages." See K.S.A. 79-5a01(a)(3).

When a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute. *In re Marriage of Killman,* 264 Kan. 33, 43, 955 P.2d 1228 (1998).

The ownership of telephonic transmission equipment is not a criterion in the definition of public utility under K.S.A. 79-5a01; therefore, this court will not construe the statute to include such. UTLD, a nonfacility-based reseller which owns no transmission or telephonic assets, is a public utility in the business of transmitting telephonic messages; therefore, it must be assessed as a public utility.

BOTA's order is reversed.