No. 105,785

In the Matter of the Appeals of Various Applicants from a Decision of the DIVISION OF PROPERTY VALUATION OF THE STATE OF KANSAS for Tax Year 2009 Pursuant to K.S.A. 74-2438 and In the Matter of the Application of Various Applicants for Exemption from Property Taxation in the STATE OF KANSAS.

(313 P.3d 789)

Opinion filed December 6, 2013.

*Robert W. Coykendall*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Will B. Wohlford*, of the same firm, was with him on the briefs for appellants.

*William E. Waters*, of Division of Property Valuation, Kansas Department of Revenue, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: This is a consolidated tax appeal disputing whether natural gas stored in facilities located in Kansas under contract with interstate companies is subject to ad valorem taxation. The Kansas Constitution, Article 11, § 1 (2012 Supp.) exempts merchants' inventory from such taxation, but that exemption does not include tangible personal property owned by a public utility. The taxpayers claim they are entitled to the exemption. They are 40 business entities that fall into three general categories: out-of-state natural gas marketing companies, out-of-state local distribution companies certified as public utilities in their states, and out-of-state municipalities. Each buys natural gas from producers or other marketers and then delivers it to the pipelines under contracts with the pipeline companies allowing the taxpayer to withdraw equivalent amounts of gas at a later time from out-of-state distribution points.

The Kansas Court of Tax Appeals (COTA) determined this natural gas is not exempt because of a statute broadly defining what constitutes a "public utility" for these purposes. See K.S.A. 2012 Supp. 79-5a01. The taxpayers challenge COTA's decision arguing, in part, that it violates the Commerce Clause of the United States Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as Article 11, § 1(b) of the Kansas Constitution (2012 Supp.), which provides for the ad valorem tax exemption for merchants' inventory.

We hold this taxation does not violate the Commerce Clause or Due Process Clause. And we hold further that K.S.A. 2012 Supp. 79-5a01 is constitutional as applied to the out-of-state local distribution companies. But we also hold that K.S.A. 2012 Supp. 79-5a01 is unconstitutional as applied to the out-of-state natural gas marketing companies and those taxpayers that are out-of-state municipalities. These entities are not public utilities as that term was commonly understood when Kansas voters excluded public utility personal property from the merchants' and manufacturers' inventory exemption.

The COTA order is affirmed in part and reversed and vacated in part. We remand to COTA for further proceedings to decide

where each taxpayer falls within the three described categories because the record on appeal is inadequate for this court to make these individual determinations.

FACTUAL AND PROCEDURAL BACKGROUND

This is the fourth time this court has addressed taxation of natural gas stored in interstate pipelines. And with each case, the governing laws have changed, presenting different legal questions and possible outcomes. We refer to those previous cases as necessary because they lay the groundwork for the principles guiding the present controversy's resolution.

This particular litigation began in 2009, when the Kansas Division of Property Valuation (PVD) determined the taxpayers were public utilities for property tax purposes under a newly amended statute defining the term "public utility" in the Kansas tax statutes. See L. 2009, ch. 97, sec. 5 (effective July 1, 2009) (now K.S.A. 2012 Supp. 79-5a01[a]). PVD concluded the taxpayers were holding natural gas for resale in storage facilities located in the state and appraised the gas and fixed assessed values thereto for ad valorem tax purposes for the 2009 tax year. See K.S.A. 2012 Supp. 79-5a01(c). PVD determined the quantity of gas each taxpayer owned in the Kansas storage facilities based on an allocation formula, adopted from one of the Federal Energy Regulatory Commission (FERC)-approved tariffs, stating:

"For purposes of reporting storage inventories for state ad valorem taxes, the total inventories of Gas in Market Area Storage Facilities and Field Area Storage Facilities in any particular state shall be determined. Inventories in Market Area Storage Facilities shall be allocated to all Shippers with inventories under Rate Schedules PS, and if provided from Market Areas Storage Facilities, WS, FS, and IWS, *based on the ratio of total inventories for the state divided by total Storage inventories for all states times the Shipper's total Stored Volume under such Rate Schedules*; inventories in Field Area Storage facilities shall be allocated to all Shippers with inventories for the state divided by total Storage inventories for all states times the Shipper's total Stored Volume under such Rate Schedules." (Emphasis added.)

Taxpayers do not challenge this allocation methodology, but they individually appealed the appraisals and filed requests for ad valorem tax exemption. In doing so, they advanced various arguments

to shield themselves from the tax. They claimed the natural gas at issue was exempt as: (1) personal property moving in interstate commerce under K.S.A. 2012 Supp. 79-201f(a); (2) merchants' and manufacturers' inventory under K.S.A. 79-201m; and (3) merchants' and manufacturers' inventory under Article 11, § 1(b) of the Kansas Constitution (2012 Supp.). They also argued taxation of this gas violates the Commerce Clause, Due Process Clause, and Import Export Clause of the United States Constitution.

PVD disagreed. It filed the exemption requests with COTA, but recommended they be denied. PVD claimed these taxpayers were public utilities, as defined by K.S.A. 2012 Supp. 79-5a01, and noted public utility inventories are not exempt under K.S.A. 2012 Supp. 79-201f or Article 11, § 1 of the Kansas Constitution (2012 Supp.). COTA consolidated the appeals and held an evidentiary hearing based in part on stipulated facts applicable to each taxpayer.

*The Taxpayers*

COTA classified the taxpayers into three general groups: (1) out-of-state natural gas marketing companies; (2) out-of-state local distribution companies that are certified as public utilities in their respective states; and (3) out-of-state municipalities. And although some of their characteristics will distinguish one group from another in a substantive way, each taxpayer shares a common business model in that it purchases natural gas from various producers or marketers and then designates when and where that gas will be delivered to one of four interstate pipelines. The taxpayer then schedules with the designated pipeline when and where an equivalent amount of gas will be redelivered to an out-of-state location where the taxpayer will take possession of it. In the meantime, gas is stored for the taxpayer somewhere in the pipeline's storage or transportation systems, which may be in Kansas or some other state. Storage is integral to the pipelines' operations, and natural gas is continually deposited and removed to satisfy essential pipeline pressure and balancing requirements, as well as to permit interstate transportation such as the simultaneous delivery and redelivery of natural gas at distant locations.

The pipelines that own the facilities in which the taxpayers' gas was stored for this tax year are FERC-regulated and owned separately by Northern Natural Gas Company, Panhandle Eastern Pipe Line Company, Colorado Interstate Gas Company, and Southern Star Central Gas Pipeline. Each pipeline company commingles the gas one customer deposits with gas deposited by other customers. No effort is made—nor could one succeed—to ensure that the same gas initially brought into the system by a customer is placed into storage and then redelivered to that same customer. The taxpayer's contractual right is simply to withdraw an amount of natural gas equivalent to the amount it deposited into the system. Each pipeline company possesses and controls the gas deposited into its system. Under FERC-approved tariffs, the pipeline companies carry the risk of loss during storage.

Each pipeline company owns and operates underground storage facilities in multiple jurisdictions, including Kansas. And none of the taxpayers owns any facilities in Kansas for the transmission, distribution, or storage of natural gas. None are certified or regulated as Kansas natural gas public utilities or vested with eminent domain powers in this state.

## COTA Proceedings

At the COTA hearing, Kent Miller, a Northern Natural Gas vice president, testified that 70 percent of its pipeline customers injected at a delivery point in Ogden, Iowa, and that half of its deliveries were made in Minnesota. This, he said, makes it "highly likely" that a Northern customer will deliver gas in Iowa and then take redelivery in Minnesota. Miller testified that under the PVD's allocation methodology natural gas would be taxed in Kansas even though it never physically entered the state.

Jeff Balfort, an official with Panhandle Eastern Pipeline Company, testified that Panhandle's pipelines cross eight or nine states and Panhandle sells various services related to the transportation and storage of natural gas for shippers. Generally, he said, Panhandle receives gas from Kansas, North Texas, and Oklahoma. And he said it transmits gas to Ohio, Illinois, Indiana, and Michigan. He testified Panhandle has "field zone" storage in Kansas and

Oklahoma and has market zone storage in Michigan, Illinois, Indiana, and Ohio. A field zone is a geographic area where natural gas is produced and gathered for sale to gas distributors, while a market zone is the geographic area where gas is sold to customers. See *In re Assessment of Personal Property Taxes*, 234 P.3d 938, 944, n.4-5 (Okla. 2008), *cert. denied sub nom. Missouri Gas Energy v. Schmidt*, 559 U.S. 970 (2010).

John Wine, a Kansas attorney who had previously served as Kansas Securities Commissioner and chair of the Kansas Corporation Commission, submitted a report and testified on the taxpayers' behalf. He expressed his opinion that public utilities share certain common characteristics in that they: (1) enjoy natural monopolies; (2) provide essential services; (3) possess restricted or protected service territories; (4) are subject to regulations that restrict the rates they can charge for services; (5) are obligated to provide a nondiscriminatory service to the public; and (6) are usually given eminent domain powers by the state. Wine also testified that the definition of public utility enacted by the Kansas Legislature in K.S.A. 2012 Supp. 79-5a01 was not consistent with his view of what constitutes a public utility, stating:

"[T]he fact that someone might be brokering or marketing a—a commodity, a natural gas commodity, does not make it a public utility looking at those common characteristics in—in any way. I mean, any more than a—a facility that held some coal that might eventually be delivered to an electric utility to burn to make electricity, it wouldn't make that—that marketer of coal a public utility."

Wine later limited this assertion to the taxpayers who are marketers and brokers of natural gas, stating: "The Marketers, Brokers, or other entities that trade in gas, and possess the right to take delivery of that gas from a federally regulated pipeline do not possess any characteristics of a public utility except for the fact that they deal in natural gas, a commodity that is highly regulated."

Regarding the other taxpayers, Wine testified that three local distribution companies operated in their home states in a manner consistent with the general meaning of a public utility, as did 13 public utilities. And when asked whether there was anything "inconsistent with them being public utilities for [certain] purposes in one state and not another," Wine responded, "There is nothing

inconsistent about that at all." But when PVD attempted to elicit similar testimony from Wine concerning five municipal utilities PVD considered local distribution companies, Wine testified he did not know if it was appropriate to call them local distribution companies if they were not a public utility, even though the municipal utilities were providing analogous services. This statement was not further clarified, and COTA factual finding No. 22, which summarizes Wine's testimony, does not address the out-of-state municipal utilities. This factual anomaly hampers our discussion of the issues related to these entities as discussed below.

COTA denied the taxpayers' exemption requests. It held that all the taxpayers were public utilities under K.S.A. 2012 Supp. 79-5a01 and, therefore, their gas did not qualify for the merchants' inventory exemption as codified in K.S.A. 79-201m. It also held the out-of-state municipalities' gas did not qualify for exemption under K.S.A. 2012 Supp. 79-201a *Second* because that statute's plain language applies only to property of municipalities or political subdivisions of the state of Kansas. Finally, COTA refrained from addressing whether the tax assessments violated the United States Constitution.

Taxpayers timely appealed. Both sides filed requests to transfer the appeal to this court under K.S.A. 20-3017 and Kansas Supreme Court Rule 8.02 (2012 Kan. Ct. R. Annot. 71), which we granted. On appeal, taxpayers argue: (1) taxing their gas violates the Due Process and Commerce Clauses of the United States Constitution; (2) the gas is exempt merchants' and manufacturers' inventory under K.S.A. 79-201m and Article 11, § 1(b) of the Kansas Constitution (2012 Supp.); (3) the gas is exempt under K.S.A. 2012 Supp. 79-201f(a) because it is moving in interstate commerce and not considered public utility inventory under K.S.A. 2012 Supp. 79-5a01; and (4) the out-of-state municipal utilities qualify for exemption under Article 11, § 1(b) of the Kansas Constitution (2012 Supp.) and K.S.A. 2012 Supp. 79-201f(a).

Our resolution permits us to reduce the issues further. We consider first the arguments concerning the Commerce and Due Process Clauses, and then whether taxpayers in any of the three groups (out-of-state natural gas marketing companies, out-of-state local

distribution companies certified as public utilities in their respective states, and out-of-state municipalities) may be considered public utilities in Kansas.

## THE COMMERCE AND DUE PROCESS CLAUSES

Taxpayers argue these ad valorem tax assessments violate the United States Constitution's Due Process and Commerce Clauses by taxing out-of-state corporations for natural gas stored in Kansas. They claim this is unconstitutional because their gas is under a common carrier's control and intermingled with other customers' gas so that there is no evidence their gas was ever actually stored in Kansas. They also note the interstate pipeline companies determine whether the gas in the pipeline's system will be stored in Kansas.

The Commerce and Due Process Clauses are closely related, but each presents distinct limits on a state's taxing power. A tax satisfying one clause does not necessarily satisfy the other because the clauses "reflect different constitutional concerns." *Quill Corp. v. North Dakota*, 504 U.S. 298, 305, 112 S. Ct. 1904, 119 L. Ed. 2d 91 (1992). The Due Process Clause "centrally concerns the fundamental fairness of governmental activity." 504 U.S. at 312. But the Commerce Clause and its nexus requirement "are informed not so much by concerns about fairness for the individual defendant as by structural concerns about the effects of state regulation on the national economy." 504 U.S. at 312. These clauses also are subject to different limits of congressional power because Congress can authorize state action burdening interstate commerce, but it cannot authorize due process violations. 504 U.S. at 305.

### Standard of Review

The Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.*, typically establishes the standard of review for appeals from COTA decisions. But COTA lacks jurisdiction to address whether taxation of the taxpayers' gas violates our state or federal Constitutions. See *In re Tax Appeal of Weisgerber*, 285 Kan. 98, 102, 169 P.3d 321 (2007); *Zarda v. State*, 250 Kan. 364, Syl. ¶ 3, 826 P.2d 1365, *cert.*

*denied* 504 U.S. 973 (1992). Accordingly, COTA correctly re-frained from addressing the constitutional claims. But those questions remain in controversy, so this court reviews them in the first instance. *Weisgerber*, 285 Kan. at 102. In the judicial review of an agency action, the reviewing court must grant relief under K.S.A. 2012 Supp. 77-621(c)(1) only if the agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied.

An appellate court's review of a statute's constitutionality is unlimited. *Miller v. Johnson*, 295 Kan. 636, 647, 289 P.3d 1098 (2012). But in addressing constitutional issues, courts are only concerned with whether the legislature had the power to enact the statute, not the wisdom behind it. A statute is presumed constitutional and all doubts must be resolved in favor of its validity. This court has both the authority and duty to construe the statute as constitutionally valid if there is any reasonable way to do so. 295 Kan. at 646-47; *In re Tax Appeal of Barton-Dobenin*, 269 Kan. 851, 855, 9 P.3d 9 (2000). A statute must clearly violate the constitution before it may be struck down. 269 Kan. at 855.

*Commerce Clause*

The Commerce Clause of the United States Constitution expressly authorizes Congress to "regulate Commerce with foreign Nations, and among the several States . . . ." U.S. Const. art. I, § 8, cl. 3. This clause has long been recognized as having both an affirmative and negative sweep. *Quill*, 504 U.S. at 309. The negative, or dormant, Commerce Clause prohibits certain state taxation even when Congress has failed to legislate on the subject. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179, 115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995). The purpose of the negative powers is to prevent "a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." 514 U.S. at 179-80.

The Court's Commerce Clause jurisprudence has evolved substantially over time—particularly as to states' taxing powers. *Quill*,

504 U.S. at 309. The Court's earliest cases broadly prohibited any form of state taxation on interstate commerce. 504 U.S. at 509 (quoting *Leloup v. Port of Mobile*, 127 U.S. 640, 648, 8 S. Ct. 1380, 32 L. Ed. 311 [1888]). But that wholesale prohibition has eroded. Under the Court's current jurisprudence, interstate commerce may be required to pay its fair share of state taxes within certain limitations. See *Quill*, 504 U.S. at 309-11.

In *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S. Ct. 1076, 51 L. Ed. 2d 326 (1977), the Court retreated from formal, categorical prohibitions of state taxation. It adopted instead a four-part test emphasizing the importance of the tax statute's practical effect. See *Quill*, 504 U.S. at 310. It held that a state may tax an activity without violating the Commerce Clause if that tax: (1) applies to an activity with a substantial nexus to the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to services or benefits provided by the taxing state. *Jefferson Lines*, 514 U.S. at 183 (quoting *Complete Auto*, 430 U.S. at 279).

The taxpayers' threshold argument is that the four-prong *Complete Auto* analysis does not govern their Commerce Clause claim because the tax here violates a bright-line rule prohibiting states from assessing taxes if the assessees' only connection with the state is through a common carrier. They rely on the United States Supreme Court's *Quill* decision. The gravamen of their claim is that interstate pipelines are common carriers, the pipelines establish the taxpayers' only connection with Kansas, and that connection is insufficient for the purpose of assessing taxes.

In *Quill*, a North Dakota statute required an out-of-state mail-order house with no North Dakota outlets or sales representatives to collect and pay use tax on goods purchased for use in North Dakota. The Court had previously declared a similar Illinois statute unconstitutional under the Due Process and Commerce Clauses in *Nat. Bellas Hess v. Dept. of Revenue*, 386 U.S. 753, 87 S. Ct. 1389, 18 L. Ed. 2d 505 (1967). The mail-order house appealed on those grounds. But the North Dakota Supreme Court declined to declare the tax unconstitutional under *Bellas Hess*, concluding that decision was rendered obsolete by the Court's later jurisprudence.

A majority of the *Quill* Court reaffirmed *Bellas Hess* as establishing a bright-line rule for sales and use taxes under the Commerce Clause: A state may not impose a use tax on an out-of-state vendor whose only connection with the state is through a common carrier. *Quill*, 504 U.S. at 314-15. And in declaring the North Dakota tax unconstitutional, the majority noted that "contemporary Commerce Clause jurisprudence might not dictate the same result were the issue to arise for the first time today," but *Bellas Hess* was not "inconsistent" with *Complete Auto* and the Court's later cases. *Quill*, 504 U.S. at 311. The majority also noted the bright-line rule established in *Bellas Hess* had "engendered substantial reliance and has become part of the basic framework of a sizeable industry." *Quill*, 504 U.S. at 317. It affirmed its rule that "in the area of sales and use taxes" a state may not impose a use tax collection on an out-of-state vendor whose only connection with the state is through a common carrier. 504 U.S. at 314-15.

There is a split of authority in our sister states on whether the Court's holding in *Quill* is limited to sales and use taxes. See *Lanco, Inc. v. Director*, Div. of Taxation, 188 N.J. 380, 382-83, 908 A.2d 176 (2006) (noting the split). In *Lanco*, the New Jersey Supreme Court held that the better interpretation of *Quill* limits its application to sales and use taxes as reflected by the Court's plain language limiting *Quill's* holding to that context. It also held the *Quill* Court did not "attempt to equate the substantial-nexus requirement with a universal physical-presence requirement." *Lanco*, 188 N.J. at 383.

We agree with the *Lanco* court. *Quill* is best restricted to sales and use taxes because the *Quill* Court specifically limited the case's holding to that context and because the Court largely relied upon stare decisis to reach its result. We reject the taxpayers' reliance on *Quill* for these reasons. We consider next what test should apply.

The taxpayers' second Commerce Clause argument relates to the *Complete Auto* test, which requires that the tax applies to an activity with a substantial nexus to the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state. See *Jefferson Lines*, 514 U.S. at 183 (quoting *Complete Auto*, 430 U.S. at 279).

Taxpayers argue the tax violates the first and fourth prongs of the *Complete Auto* test, *i.e.*, the tax is neither fairly apportioned, nor fairly related to services provided by the state.

We note those prongs are related and require a "substantial nexus and a relationship between the tax and state-provided services, limit[ing] the reach of state taxing authority so as to ensure that state taxation does not unduly burden interstate commerce." *Quill*, 504 U.S. at 313. The taxpayers argue the tax here violates the Commerce Clause because their business is conducted primarily outside Kansas, none of them have Kansas facilities or employees, and none "own property or facilities in Kansas for the transmission, distribution or storage of natural gas." They contend the natural gas stored in Kansas does not establish the required nexus because the taxpayers do not control or possess the gas; the gas is intermingled with gas owned by others; and they do not direct their business activities to Kansas—the pipeline companies determine where the gas is stored.

We are not the first court to address this question. The Oklahoma Supreme Court and Texas Court of Appeals have split on whether similar ad valorem taxes on natural gas stored in an interstate pipeline violated the Commerce Clause. See *In re Assessment*, 234 P.3d at 952-59 (Oklahoma tax assessments did not violate Commerce Clause); *Peoples Gas, Light v. Harrison Cent. App.*, 270 S.W.3d 208, 217-19 (Tex. App. 2008) (Texas tax assessments violated Commerce Clause). These cases demonstrate this is a difficult question. But after reviewing both, we agree with the Oklahoma Supreme Court and hold these taxes do not violate the Commerce Clause.

In *Peoples*, a Texas taxing jurisdiction assessed ad valorem taxes against a natural gas distribution company's gas stored in an interstate pipeline company's storage facility. The pipeline company's method of allocating stored gas to the distribution company was not disputed. The Texas court first held that Peoples owned the natural gas at issue, even though the pipeline company had full custody and control of the gas. The court noted that FERC regulations did not permit ownership rights to the gas to be transferred to the pipeline company, so it held "legal title must lie with Peo-

ples." 270 S.W.3d at 213-14. Nevertheless, the court struck down the Texas assessment under the Commerce Clause after holding it failed to meet the first and fourth prongs of the *Complete Auto* test. *Peoples*, 270 S.W.3d at 217-19.

As to the first prong's substantial nexus requirement, the court held there was not a substantial nexus between the taxing entity and the taxpayer, property, or transaction subject to the tax. It reached this result, even though the natural gas distributor owned tangible personal property located in Texas, because Peoples did not have any employees, representatives, or physical facilities in the state. It also found persuasive the argument that the pipeline company controlled whether the natural gas was stored in Texas; and it held Peoples' only connection to Texas was the pipeline company's decision to store natural gas there. The court concluded that "such a connection is too tenuous to subject Peoples to ad valorem taxation in Texas." 270 S.W.3d at 218.

The *Peoples* court also held that the fourth prong, requiring the tax be fairly related to the services provided by the state, was not met. In particular, Peoples was not the beneficiary of Texas services. The court explained that, in its view, the pipeline company was the only beneficiary, stating:

"[S]ervices such as law enforcement and the fire department would serve the [Texas] facility itself, and the facility undoubtedly belongs to Pipeline, which does pay ad valorem taxes on both the 'cushion' gas it maintains in the facility and the physical plant of the facility itself." 270 S.W.3d at 219.

In contrast, the Oklahoma Supreme Court upheld the taxation of a Missouri natural gas distributor's gas, which was similarly stored in an interstate pipeline company's storage facility. *In re Assessment*, 234 P.3d at 952-59. The distribution company (MGE) did not sell natural gas in Oklahoma, employ anyone in Oklahoma, or maintain any Oklahoma facilities. But it purchased gas from suppliers in other states and used a pipeline company with Oklahoma storage facilities to transport and store the natural gas. Like the taxpayers in this case, the gas distribution company argued the assessment violated the Due Process and Commerce Clauses.

Regarding the Commerce Clause, a majority of the Oklahoma court held that *Complete Auto*'s substantial nexus requirement was

satisfied, even though the distributor had no control over where the gas was stored and the pipeline company benefited from its ability to store it. The court said the "storage of gas [was] not only anticipated by MGE [the distributor], but intended." *In re Assessment*, 234 P.3d at 955. It went on to explain:

"While MGE cannot direct the pipeline to use the Woods County facility, it contracts for storage knowing that the Woods County facility is one of two Field Zone storage facilities. If gas is stored there, and it is, MGE cannot claim it does not intend for that to happen. Were the court making the old 'in transit' or 'at rest' determination, this record would make that determination very difficult. Inasmuch as the subjective factors are inconclusive, *the nexus issue is better decided on the basis of the objective fact that Panhandle stored gas on behalf of MGE and that a certain amount of it was held at North Hopeton at all times during the tax years in question.*" (Emphasis added.) 234 P.3d at 955.

The court also held the tax was reasonably related to services provided by the state. In reaching this holding, the court determined the controlling question was " 'whether the state has given anything for which it can ask return.' " 234 P.3d at 959. The court concluded MGE was simply shouldering its fair share of the taxes "for the support of government-provided services and the receipt of 'the advantages of a civilized society.' " 234 P.3d at 959. It noted the tax was assessed against personal property located in the taxing jurisdiction and MGE's gas was taxed to the same extent as other personal property in the jurisdiction. 234 P.3d at 959.

But there is one distinction between *In re Assessment* and this case because MGE's natural gas was not just stored in Oklahoma—it also was produced there. And this could arguably impact the substantial nexus analysis. But the *In re Assessment* court did not indicate production of the gas within the state was significant to its analysis of the first and fourth *Complete Auto* prongs. And we see no distinction of merit, principally because this is an ad valorem tax on stored natural gas, not a severance tax. *Cf. Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 101 S. Ct. 2946, 69 L. Ed. 2d 884 (1981) (upholding severance tax on coal mined in Montana and noting substantial nexus between activity of coal mining and state in which the activity occurs). We agree with the Oklahoma Supreme Court that the most important factor in determining

whether a substantial nexus exists to tax the taxpayers' gas is that this is a personal property tax on stored natural gas that was located in Kansas on the assessment date.

We reject the taxpayers' arguments that ad valorem taxation of their stored natural gas fails to satisfy the first and fourth prongs of the *Complete Auto* test. There is axiomatically a substantial nexus between Kansas and the gas stored in this state. And ad valorem taxes, which are levied upon property situated in Kansas, are fairly related to the taxpayers' contact with Kansas, *i.e.*, their storage of gas in this state. All property in Kansas is subject to ad valorem taxation, unless otherwise exempt. K.S.A. 79-101. For the purposes of this Commerce Clause analysis, ad valorem taxes will be levied upon the assessed value of the taxpayers' gas at the same rate as ad valorem taxes levied upon the other assessed property in the applicable taxing jurisdictions. See K.S.A. 79-5a25 (assessed value of public utility property to be apportioned among taxing jurisdictions in which property is located); K.S.A. 2012 Supp. 79-1803 (tax levy rate to apply equally to all real and personal property subject to the same tax); accord *In re Assessment*, 234 P.3d at 959. We hold that the challenged ad valorem tax does not violate the Commerce Clause.

*Due Process*

The United States Supreme Court has held that due process " 'requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax,' " as well as some rational relationship between the tax and the " ' "values connected with the taxing State." ' " *Quill*, 504 U.S. at 306; accord *MeadWestvaco Corp. v. Illinois Dept. of Revenue*, 553 U.S. 16, 24, 128 S. Ct. 1498, 170 L. Ed. 2d 404 (2008). The taxpayers argue they lack the necessary minimum contacts with Kansas to permit ad valorem taxation of their gas and that the pipeline companies' independent decisions to store the gas in Kansas cannot establish the necessary contacts.

PVD argues minimum contacts exist because the taxpayers "have some expectation that some of the natural gas that they consign to the pipelines will be stored in Kansas." It then characterizes the

pipeline companies as independent contractors and argues their activities are enough to establish the necessary contact. PVD further argues that "it is not the taxpayers' activities that are taxed, but tangible personal property—natural gas—that is owned by the taxpayers and physically located in the state."

The Oklahoma Supreme Court in *In re Assessment of Personal Property Taxes*, 234 P.3d 938 (Okla. 2008), *cert. denied* 559 U.S. 970 (2010), also addressed a similar, but differently framed due process issue. In that case, the taxpayer argued the assessment violated due process because its gas was moving in interstate commerce and therefore did not have a tax situs in Oklahoma. The court noted due process requires a nexus between the taxed property and the taxing state, but that this nexus requirement is minimal under the Due Process Clause. 234 P.3d at 950. It held the gas' "sojourn in storage in Oklahoma gives it at least a minimal nexus . . . sufficient to establish tax situs and to survive the due process attack," even if the parties intended that the natural gas would ultimately be delivered to Missouri. 234 P.3d at 950.

We agree with the *In re Assessment* court and hold there are sufficient contacts between the taxpayers' gas and the State of Kansas to eliminate any due process concerns. Specifically, the taxpayers own tangible personal property stored in Kansas. And the property is stored in this state under the taxpayers' contracts with pipeline companies that own storage facilities in Kansas. Accordingly, there is a sufficient nexus between the taxpayers' gas and the State of Kansas to establish the minimum contacts necessary to satisfy due process.

## Taxpayers' Status as Public Utilities

The Kansas Constitution, Article 11, § 1(b) (2012 Supp.) exempts merchants' and manufacturers' inventory from property taxation, except inventory owned by a public utility. The legislature has defined what will constitute this subclass of public utility tangible personal property. See Kan. Const. art. 11, § 1(a) (2012 Supp.) ("Class 2—tangible personal property . . . shall be defined by law for the purpose of subclassification"—*i.e.*, subclass [3]). The

statutory definition of "public utility" subject to this appeal appears in K.S.A. 2012 Supp. 79-5a01[a], which states in pertinent part:

"[T]he terms 'public utility' or 'public utilities' means every individual, company, corporation, association of persons, brokers, marketers, lessees or receivers that now or hereafter own, broker or market natural gas inventories stored for resale in an underground formation in this state, or now or hereafter are in control, manage or operate a business of:

. . . .

(4) transporting or distributing to, from, through or in this state natural gas, oil or other commodities in pipes or pipelines, or engaging primarily in the business of storing natural gas in an underground formation." K.S.A. 2012 Supp. 79-5a01(a)(4).

PVD argues the taxpayers' Kansas-stored gas is taxable public utility tangible personal property under the Kansas Constitution, Article 11, § 1 (2012 Supp.) and K.S.A. 2012 Supp. 79-5a01. The taxpayers admit they fit within the statutory definition but argue the definition's expansive scope is inconsistent with the common meaning of "public utility" when Kansas voters ratified the constitutional amendment excepting public utility tangible personal property from the merchants' and manufacturers' inventory exemption. See L. 1992, ch. 342, sec. 1 (now Kan. Const. art. 11, § 1 [2012 Supp.]). This, the taxpayers contend, renders the statute unconstitutional. We begin by summarizing the history underlying the constitutional provision and its statutory progeny.

*Article 11 and Our Cases Involving Taxing Stored Natural Gas*

A constitutional amendment exempting merchants' and manufacturers' inventory from ad valorem taxation was first adopted by voters in 1986. It read: "[M]erchant[s'] and manufacturer[s'] inventories . . . . shall be exempted from property taxation." L. 1985, ch. 364, sec. 1; Kan. Const. art. 11, § 1(b)(2). At that time, public utility tangible personal property was not exempt from ad valorem taxation. See Kan. Const. art. 11, § 1(b)(1—Class 2, subclass (C). In 1988, the legislature statutorily enacted the merchants' and manufacturers' inventory exemption. See L. 1988, ch. 375, sec. 2 (now K.S.A. 79-201m). It defined the terms "merchant" and "inventory" as follows:

" '(a) "Merchant" means and includes every person, company or corporation who shall own or hold, subject to their control, any tangible personal property within this state which shall have been purchased for resale without modification or change in form or substance, and without any intervening use;

. . . .

" '(c) "inventory" means and includes those items of tangible personal property that: (1) Are held for sale in the ordinary course of business (finished goods); (2) are in process of production for such sale (work in process); or (3) are to be consumed either directly or indirectly in the production of finished goods (raw materials and supplies). Assets subject to depreciation or cost recovery accounting for federal income tax purposes shall not be classified as inventory. A depreciable asset that is retired from regular use and held for sale or as standby or as surplus equipment shall not be classified as inventory.' " *Colorado Interstate Gas Co. v. Board of Morton County Comm'rs*, 247 Kan. 654, 656-57, 802 P.2d 584 (1990) (quoting K.S.A. 1988 Supp. 79-201m[a], [c]).

Litigation quickly arose over whether natural gas stored in pipelines located within the state was exempt merchants' inventory under these definitions. See *Colorado Interstate Gas*, 247 Kan. at 655.

In *Colorado Interstate Gas*, the taxpayers were interstate pipeline companies that owned the natural gas at issue. They argued their stored gas was exempt merchants' and manufacturers' inventory, and PVD agreed based on the plain language of the then-existing statute, K.S.A. 1988 Supp. 79-201m. But the Board of Tax Appeals (BOTA), which was the predecessor to COTA, reversed PVD's determination. BOTA accepted that the stored natural gas was "inventory," but BOTA concluded the pipeline companies were not "merchants" or "manufacturers." *Colorado Interstate Gas*, 247 Kan. at 658. In support, BOTA cited the legislative development of the constitutional provision; the fact that public utilities were taxed under a different statute before the provision was adopted; and various affidavits from legislators claiming the provision was not intended to alter the assessment and taxation of public utility inventories. See 247 Kan. at 661-62. The pipeline companies appealed.

The *Colorado Interstate Gas* court held the pipeline companies were "merchants" as defined by K.S.A. 1988 Supp. 79-201m. The court reached that conclusion after finding the relevant portions of Article 11, § 1 of the Kansas Constitution exempting merchants' and manufacturers' inventory were self-executing, which meant the

exemptions were granted by the amendment itself. 247 Kan. at 659. The court then summarized the legislature's limited authority in this area, stating:

" 'The rule is that a self-executing provision of the constitution does not necessarily exhaust legislative power on the subject, but any legislation must be in harmony with the constitution and further the exercise of [the] constitutional right to make it more available. Thus, even in the case of a constitutional provision which is self-executing, the legislature may enact legislation to facilitate the exercise of the powers directly granted by the constitution; legislation may be enacted to facilitate the operation of such a provision, prescribe a practice to be used for its enforcement, provide a convenient remedy for the protection of the rights secured or the determination thereof, or place reasonable safeguards around the exercise of the right. And, even though a provision states that it is self-executing, some legislative action may be necessary to effectuate its purposes. But legislative authority to provide the method of exercising a constitutional power exists only where the constitutional provisions themselves do not provide the manner and means and methods for executing the powers therein conferred. Procedure prescribed in a self-executing provision must be followed to the exclusion of that prescribed by statute, and failure to comply with the provisions of a statute which differ from those in the constitutional provision is not a defect.

" 'It is clear that legislation which would defeat or even restrict a self-executing mandate of the constitution is beyond the power of the legislature. Also, the legislature is neither required nor permitted to enact laws purporting to confer rights in excess of and different from those contemplated by the constitution. A liability imposed by a self-executing provision is absolute and not subject to legislative enlargement or lessening or restriction as to manner of enforcement.' " 247 Kan. at 659-60 (quoting 16 Am. Jur. 2d, Constitutional Law § 139).

To determine whether the pipeline companies were merchants or manufacturers within the constitution's meaning, the court recited several rules of constitutional construction, one of which was that "[a] constitution . . . should be held to mean what the words imply to the common understanding of men." 247 Kan. at 660. It noted this test is "what meaning people of common understanding would give to the words in question." 247 Kan. at 660. The court observed that the K.S.A. 1988 Supp. 79-201m definition of "merchant" was consistent with definitions of "merchant" used in prior Kansas caselaw and found in a dictionary. It then held the pipeline companies were merchants because they "are clearly and undisputedly in the business of buying and selling natural gas." 247 Kan.

at 661. The court discredited BOTA's analysis to determine that public utilities cannot be merchants or manufacturers, stating:

"The problem here is that in enacting the proposed constitutional amendment the legislature determined the size of the mesh in the net and the requisite number of voters approved the mesh size. The mesh size is thus fixed in the constitution. The fact that unintended varieties of fish may pass through the mesh has little bearing on anything." 247 Kan. at 662.

In other words, the *Colorado Interstate Gas* court applied what it determined to be the constitution's plain language to hold that the pipeline companies were included within the merchants' inventory exemption, regardless of any contrary legislative intent. 247 Kan. at 662 ("Under the circumstances, this court can only apply the clear language of the [constitutional] amendment.").

In 1992, Article 11, § 1 of the Kansas Constitution was amended to accomplish what the previous amendment establishing the merchants' and manufacturers' inventory exemption had not: it expressly excluded property falling within the public utility tangible personal property subclass from the exemption. Kan. Const. art. 11, § 1(b) (2012 Supp.); L. 1992, ch. 42, sec. 1. Article 11, § 1 retained its clear grant of authority to the legislature to define the public utility tangible personal property subclass. See Kan. Const. art. 11, § 1(a) (2012 Supp.).

At the time the 1992 constitutional amendment was adopted, K.S.A. 79-5a01(a) (Ensley 1989) defined the term "public utility" in part as:

"every individual, company, corporation, association of persons, lessees or receivers that now or hereafter are in control, manage or operate a business of:

. . . .

(4) transporting or distributing *to, from, through or in this state* natural gas, oil or other commodities in pipes or pipelines, or engaging primarily in the business of storing natural gas in an underground formation." (Emphasis added.) L. 1986, ch. 371, sec. 1.

The statutory provisions defining public utility to include the natural gas pipelines remained unchanged when litigation arose again regarding taxation of natural gas stored in Kansas pipelines. See K.S.A. 2002 Supp. 79-5a01; *In re Tax Exemption Application of Central Illinois Public Services Co.*, 276 Kan. 612, 78 P.3d 419

(2003). But in *Central Illinois*, the taxpayers were no longer pipeline companies because by this time FERC had issued a federal regulatory order divesting pipeline companies of their ownership interest in the gas, so the property tax was levied against the pipeline companies' customers.

In *Central Illinois*, the taxpayers were three out-of-state public utilities, one out-of-state municipal corporation, and one out-of-state political subdivision. Each owned gas stored in an interstate pipeline system's Kansas storage facility. The taxpayers sought ad valorem tax exemptions for their gas pursuant to the merchants' inventory exemption. All five taxpayers engaged in the business of selling or distributing natural gas, and all owned gas stored in a Kansas pipeline—but none delivered, sold, traded, or otherwise disposed of natural gas within Kansas. BOTA granted the exemption requests, holding the taxpayers were not public utilities, as defined in K.S.A. 2002 Supp. 79-5a01, and the taxpayers' gas therefore constituted exempt merchants' inventory. This court agreed. 276 Kan. at 621-22.

The *Central Illinois* court began its decision by affirming the previous rationale from *Colorado Interstate Gas* that the Article 11 merchants' inventory exemption was self-executing. But it also noted the 1992 constitutional amendment gave the legislature some authority to define what would constitute the public utility tangible personal property subject to the amendment's exemption. But that authority, the court held, was not limitless because "as we stated in *Colorado Interstate Gas*, the legislature's definition *must conform to the commonly understood meaning of the term*." (Emphasis added.) 276 Kan. at 619. Citing *State ex rel. Stephan v. Parrish*, 256 Kan. 746, 762, 887 P.2d 127 (1994), this court explained that the legislative definition "must bear a reasonable and recognizable similarity to generally accepted definitions and the common understanding of the term by the people of Kansas." *Central Illinois*, 276 Kan. at 620.

The *Central Illinois* court held that the statutory definition of "public utility" in K.S.A. 2002 Supp. 79-5a01 conformed to the common understanding of the term at the time of the constitutional amendment's adoption, despite the fact that the statute de-

fined public utilities to include only those entities doing business in Kansas. The court explained that it approved this statutory definition because the legislature did not limit it to "avoid a constitutional provision by defining a constitutional term in a manner different from the common understanding." 276 Kan. at 620. The court also cited a rule of construction requiring that " '[a] statute and pertinent constitutional provisions must be construed together with a view to make effective the legislative intent rather than defeat it.' " 276 Kan. at 621. And it held the only way to determine legislative intent was to look at the statutes in existence at the time the constitutional amendment was proposed and adopted. The court then applied the definition of public utility in K.S.A. 2002 Supp. 79-5a01 and held the taxpayers qualified for the merchants' inventory exemption because they were not public utilities operating in Kansas. See 276 Kan. at 622. The court made no effort to provide its own definition for the term "public utility."

In 2004, the year following the *Central Illinois* decision, the legislature once again redefined public utility to include entities that "own, control *and* hold for resale stored natural gas in an underground formation in this state . . . ." (Emphasis added.) L. 2004, ch. 171, sec. 4. And in response to that statutory change, PVD assessed natural gas stored by 44 out-of-state municipal utilities, marketing companies, and public utilities, which led to another round of litigation. See *In re Appeal of Director of Property Valuation*, 284 Kan. 592, 593, 161 P.3d 755 (2007) (citing K.S.A. 2006 Supp. 79-5a01).

In that appeal, the taxpayers argued they were not public utilities within the plain language of K.S.A. 2006 Supp. 79-5a01 because they did not control the natural gas while it was in the pipelines. BOTA agreed, ruling that K.S.A. 2006 Supp. 79-5a01 imposed three requirements—that the public utility own, control, and hold for resale the natural gas in underground storage. It held all three requirements were not met. The PVD appealed, arguing in part that BOTA "ignored legislative intent." PVD also argued the "and" in K.S.A. 2006 Supp. 79-5a01 should be construed as "or." And as an alternative claim, PVD argued the taxpayers had satisfied all three requirements. See 284 Kan. at 596-601.

The court agreed with the taxpayers and held they fell outside the K.S.A. 2006 Supp. 79-5a01(a) definition of public utility because the pipeline companies, rather than the taxpayers, controlled the natural gas at all times it was in the pipeline system. With this rationale, the natural gas was exempt as merchants' inventory. 284 Kan. at 606.

In 2009, the legislature amended the definition of public utility in K.S.A. 79-5a01 again. L. 2009, ch. 97, sec. 5; see K.S.A. 2012 Supp. 79-5a01. That amendment led to the controversy underlying this appeal.

*Current Law*

K.S.A. 2012 Supp. 79-5a01(a) now defines public utility to include "every individual, company, corporation, association of persons, brokers, marketers, lessees or receivers *that now or hereafter own, broker or market natural gas inventories stored for resale in an underground formation in this state . . . ."* (Emphasis added.) The taxpayers admit they fit within that definition, but they argue K.S.A. 2012 Supp. 79-5a01 is unconstitutional because it is inconsistent with the commonly understood meaning people of Kansas would have given the words "public utility tangible personal property" at the time they voted for the constitutional amendment in 1992. They also claim "the meaning of the term 'public utility' as used in [the] constitutional amendment passed in 1992 is the statutory definition of 'public utility' for ad valorem tax purposes that was in existence at the time of the passage of the amendment," citing this court's *Central Illinois* decision.

PVD disagrees and argues the definition of public utility adopted in K.S.A. 2012 Supp. 79-5a01 is consistent with people's common understanding of the term and is a valid exercise of the legislature's authority to define property for subclassification under Article 11, § 1 of the Kansas Constitution (2012 Supp.).

We begin with the taxpayers' argument that under the *Central Illinois* decision the constitutional definition of public utility is frozen in time and the statutory definition in existence in 1992 has become the constitutional definition. The taxpayers urge this court to interpret *Central Illinois* as establishing the one and only defi-

nition of public utility applicable to Article 11, § 1 of the Kansas Constitution (2012 Supp.). Support for their argument principally arises from the court's application of the rule that legislative intent must be determined by the statutes that existed *at the time the constitutional amendment was proposed and adopted.* 276 Kan. at 621-22. But, if that is true, the statute in effect at the time the amendment was adopted would always control; and that runs afoul of the legislature's continuing (but limited) constitutional authority to define the subclasses, including public utility tangible personal property.

In *Central Illinois*, the court simply upheld the statutory definition of public utility in K.S.A. 2002 Supp. 79-5a01(a), even though it was not the only definition that could conform to the common understanding of the term. And unlike the *Colorado Interstate Gas* court, which examined prior caselaw and the dictionary in an attempt to ascertain the common meaning of merchants' inventory, the *Central Illinois* court simply looked at the statute and determined it was close enough—without defining more generally the term's common meaning. Otherwise, Article 11's grant of legislative authority to define the subclasses would be meaningless. See 276 Kan. at 621-22.

This view of *Central Illinois* is consistent with how the court treated the legislature's failed attempt to modify K.S.A. 2006 Supp. 79-5a01(a) in the more recent decision of *In re Appeal of Director of Property Valuation,* 284 Kan. at 604. There this court held the legislature was unsuccessful in its first attempt to redefine public utility because the taxpayers were not included within the unambiguous statutory language defining public utility in K.S.A. 2006 Supp. 79-5a01(a). 284 Kan. at 606. Notably, the court did not hold the legislature was limited to the definition of public utility in K.S.A. 2002 Supp. 79-5a01(a). We held the legislature was—and is—free to amend the definition of public utility. We address next whether the legislature's definition of public utility under K.S.A. 2012 Supp. 79-5a01 is unconstitutional.

To be constitutional, the legislative definition must bear a reasonable and recognizable similarity to generally accepted definitions and the common understanding of the term by the people of

Kansas. See *Central Illinois*, 276 Kan. at 620. The parties present two sources for identifying the common meaning of the term "public utilities": the common characteristics recognized by the taxpayers' expert witness and a dictionary definition.

John Wine, the former Kansas Corporation Commission chair, was the only witness to testify about the characteristics commonly associated with public utilities. He identified these as: (1) enjoying natural monopolies; (2) providing essential services; (3) possessing restricted or protected service territories; (4) subjection to regulation that restricts the rates that can be charged for services; (5) obligations to provide non-discriminatory services to the public; and (6) usually enjoying eminent domain powers. The taxpayers advocate for this court to adopt Wine's definition of public utility.

PVD urges this court to use the dictionary definition from Webster's II New College Dictionary 952 (1st ed. 1984), which describes a public utility as " '[a] private business organization, subject to governmental regulation, that provides an essential commodity or service, such as water, electricity, or communication, to the public." *Cf.* Merriam-Webster's Collegiate Dictionary 1006 (11th ed. 2003) ("a business organization [as an electric company] performing a public service and subject to special governmental regulation").

PVD interprets the dictionary definition as having three elements: (1) an essential commodity; (2) private business organizations; and (3) subject to regulation. PVD argues the first element is satisfied because natural gas is an essential commodity. It reaches that conclusion by ignoring the surrounding words which require that a public utility *"provides an* essential commodity . . . *to the public."* PVD then argues the second element is met because the taxpayers are private business organizations. But this is not accurate as to all the taxpayers because some are publicly held out-of-state municipal utilities, some are out-of-state public utilities, and some are out-of-state marketers and brokers. Finally, PVD argues the marketers and brokers are subject to regulation by the federal Energy Policy Act of 2005, which regulates the purchase and sale of natural gas. PVD's deconstruction saps the dictionary definition of all meaning and reaches an absurd result.

But despite both parties' attempts to lump the taxpayers into one group and conclude that either all or none of them are public utilities, we must address each group individually because they have different business purposes and structures. See *Cities Service Gas Co. v. State Corporation Commission*, 222 Kan. 598, 609, 567 P.2d 1343 (1977) ("[W]hether a business is a public utility must, of necessity, be determined by the character of its operations.").

*Marketers and Brokers of Natural Gas*

Wine concluded that none of the taxpayers met his definition of a public utility, although on a closer examination of his testimony it appears different reasoning applied to particular groups. As to the marketers and brokers, he said they did not meet the common characteristics he established. But as to the other two groups, his conclusion appears to have been based on the prior language of K.S.A. 79-5a01 defining public utility to exclude entities not doing business in Kansas.

In his report, Wine stated: "The Marketers, Brokers, or other entities that trade in gas, and possess the right to take delivery of that gas from a federally regulated pipeline do not possess any characteristics of a public utility except for the fact that they deal in natural gas, a commodity that is highly regulated." But at the hearing, Wine testified the current definition of public utility adopted by the Kansas Legislature in K.S.A. 2012 Supp. 79-5a01 was inconsistent with his view of what a public utility is, stating:

"[T]he fact that someone might be brokering or marketing a—a commodity, a natural gas commodity, does not make it a public utility looking at those common characteristics in—in any way. I mean, any more than a—a facility that held some coal that might eventually be delivered to an electric utility to burn to make electricity, it wouldn't make that—that marketer of coal a public utility."

PVD urges this court to find the marketers and brokers are nevertheless public utilities, analogizing the marketers and brokers to resellers of telecommunication services. PVD cites *In re Appeal of United Teleservices, Inc.*, 267 Kan. 570, 983 P.2d 250 (1999). In that case, United Telephone Long Distance Company (UTLD) claimed it could not be taxed under K.S.A. 79-5a01(a)(3), which defined a public utility as a company operating a business of

" 'transmitting to, from, through, or in this state telephonic messages.' " 267 Kan. at 573. UTLD was a reseller of long distance services, which its expert described as:

" '[W]hat resellers do is resell the services of the interexchange companies. And so in effect they don't own fiber, they don't own switches, they don't own what we call POPs, points of presence. They're simply a marketing entity that tries to find a market and sell what they have purchased from the interexchange carriers.' " 267 Kan. at 573.

The question before the *United Teleservices* court was "whether the State has authority to assess UTLD as a business transmitting telephonic messages, *i.e.*, a public utility." 267 Kan. at 573. The parties' arguments concerned the interpretation of K.S.A. 79-5a01(a)(3). But the parties did not argue the statutory language was inconsistent with the meaning of the term "public utility" in Article 11, § 1. See Kan. Const. art. 11, § 1 (2012 Supp.). In other words, the court was asked whether UTLD fit the definition of public utility established by the legislature in K.S.A. 79-5a01(a)(3)—not whether that definition was consistent with people's common understanding of the term. The court held UTLD met the statutory definition because it purchased access for long distance service from Sprint and then sold that service to consumers. Thus, "UTLD operates a business of transmitting telephonic messages by contracting for the service." 267 Kan. at 581-82.

PVD is correct that both UTLD and the marketers and brokers of natural gas in this appeal are resellers of a commodity. But *United Teleservices* is distinguishable because a different question was asked and answered. The *United Teleservices* court did not decide whether the legislature's definition of public utility was consistent with the Kansas Constitution. It simply determined whether UTLD fit within a statutory definition the legislature had established. Therefore, this case does not support PVD's claim that these marketers and brokers are public utilities under the common meaning of the term as constitutionally adopted in Kansas.

We hold that the natural gas marketers and brokers in this appeal are not public utilities as that term is used in Article 11, § 1 of the Kansas Constitution (2012 Supp.). This is because they are not obligated to provide nondiscriminatory services to the public, do

not have eminent domain powers, and do not enjoy natural monopolies. These entities do not possess Wine's common public utility characteristics, and they do not fall within the dictionary definition of "public utility." Accordingly, we conclude they are not public utilities under that term's common meaning as used in Article 11, § 1. See *Colorado Interstate Gas Co. v. Board of Morton County Comm'rs*, 247 Kan. 654, 660-61, 802 P.2d 584 (1990). K.S.A. 2012 Supp. 79-5a01 is unconstitutional as applied to the natural gas brokers and marketers.

*Local Distribution Companies Certified as Public Utilities in Other States*

At the COTA hearing, Wine conceded the public utilities operating in other states and the local distribution companies met his definition of "public utilities," *i.e.*, including them within the K.S.A. 2012 Supp. 79-5a01 definition was consistent with the term's common meaning. The taxpayers' argument for why these entities are exempt is not entirely clear. But it appears to be premised on the contention, rejected above, that this court must define "public utility" for the purposes of Article 11, § 1 of the Kansas Constitution (2012 Supp.), as the term was defined in K.S.A. 2002 Supp. 79-5a01 at the time of the *Central Illinois* decision. And absent the previous statutory language in K.S.A. 2002 Supp. 79-5a01 limiting public utilities to utilities operating in this state, there is no basis for concluding these entities are not public utilities for the purposes of Article 11, § 1 of the Kansas Constitution (2012 Supp.) or K.S.A. 2012 Supp. 79-5a01.

We hold the statute is constitutional as applied to these taxpayers, and we affirm the denial of their tax exemption claims. See *State v. Limon*, 280 Kan. 275, 302-03, 122 P.3d 22 (2005) (constitutional part of statute may stand while the unconstitutional part is rejected); *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City*, 264 Kan. 293, 316, 955 P.2d 1136 (1998) (same).

*Out-of-state Municipal Utilities*

PVD also attempted to elicit testimony from Wine concerning the municipal utilities it considered local distribution companies,

but Wine testified he did not know if it was appropriate to call them local distribution companies if they were not public utilities, even though the municipal utilities were providing analogous services. This statement was not further clarified, and COTA did not make a finding relevant to this taxpayer group.

Notably, the dictionary definition of "public utility" PVD cites to this court limits public utilities to "private business organization[s]." Webster's II New College Dictionary 952 (1st ed. 1984). But see Merriam-Webster's Collegiate Dictionary 1006 (11th ed. 2003) (defining "public utility" as "a business organization . . . performing a public service and subject to special governmental regulation"). We hold that people's common understanding of the term "public utility" would not bring within its grasp municipally owned entities providing utility services to a municipality's citizens.

PVD's favored definition of "public utility" includes within the term only private business organizations, and Wine could not say whether municipal utilities could be considered public utilities under the common characteristics to which he testified. Moreover, both PVD's and Wine's understanding of the term included a regulatory component. And at the time Kansas voters added the "public utility" subclass to the constitution in 1985—and in the decades prior—Kansas treated municipal utilities and public utilities differently for regulatory purposes. Specifically, municipal utilities enjoyed a degree of self-regulation not available to other public utilities. See L. 1978, ch. 263, secs. 1, 2 (now codified at K.S.A. 2012 Supp. 66-104) ("public utility" subject to Kansas Corporation Commission's regulatory jurisdiction do not include municipally owned or operated utility located in municipality's corporate boundaries, but such entities "deemed" public utilities for certain purposes); see also *Kansas Public Service Co. v. State Corporation Commission*, 199 Kan. 736, 746, 433 P.2d 572 (1967) (power to control and regulate " 'one-city' public utilities" belongs exclusively to city); *Holton Creamery Co. v. Brown*, 137 Kan. 418, 421, 20 P.2d 503 (1933) (state utilities act provided that no category applied to any public utility owned and operated by municipality in this state was " 'plain and unambiguous exclusion from the definition of "public utilities" of public utilities owned and operated by municipalities.' "

[quoting *Humphrey v. City of Pratt*, 93 Kan. 413, 417, 144 P. 197 (1914)]).

The definition PVD advances, which restricts public utilities to private business organizations, is consistent with the common meaning of public utility—particularly in light of Kansas' regulatory discernment between true public utilities on one hand and municipal utilities on the other. It is also consistent to exclude municipal utilities as governmental entities from a provision intended to impose a tax burden. And it is unrealistic to believe voters would understand the amendment to impose an ad valorem tax on a governmental body. Out-of-state municipal utilities are exempt under Article 11, § 1(b) of the Kansas Constitution (2012 Supp.).

In light of this holding, the remaining issues raised on appeal are moot. We remand to COTA to determine which taxpayers fall within each of the three generally described categories identified previously by COTA. The record on appeal provided to this court does not give sufficient detail to complete that analysis.

The COTA decision is affirmed in part and reversed and vacated in part, and the matter is remanded to COTA with directions.